## THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS - CWA, AFL-CIO, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:05-civ-01850-RCL |
| v. | ) ) | |
| ELAINE L. CHAO and MARION BLAKEY, | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### Preliminary Statement

Since 1975, the FAA has zealously guarded its asserted right to maintain complete and exclusive jurisdiction over crewmember health and safety aboard aircraft in operation. During those thirty (30) years, however, the FAA has done virtually nothing to regulate the hazardous working conditions experienced daily by flight attendants. Instead, the agency has relied on "voluntary" safety guidelines and other "advisory" measures to encourage airlines to maintain a safe workplace for flight attendants. And most significantly, the FAA has avoided the implementation of occupational health and safety standards by arguing repeatedly that the establishment of those standards are impossible since the health and safety of crewmembers are "inextricably" intertwined with the health and safety of the traveling public.

As a result of this institutional aversion to mandatory occupational standards aboard aircraft, flight attendants have suffered from exorbitant rates of injury as measured against the general work

population. As a result, AFA and TTD have brought this action to compel OSHA to comply with its statutory obligations to address this regulatory vacuum and protect the occupational health and safety of flight attendants.

Now the FAA moves to dismiss this action based upon a lack of judicial ripeness, a failure to state a claim and on jurisdictional grounds. Because there is no specific agency action under review, nor any rulemaking procedure at issue, the FAA argues that its blatant failure to *exercise* its jurisdiction over crewmember occupational health and safety can escape this Court's scrutiny. To the contrary, as discussed herein, this action is ripe as the FAA's failure to regulate is a legal/factual issue that is well-developed, and postponement of judicial review will only cause more flight attendant injuries. In addition, AFA has clearly stated a claim to declare that the FAA has failed to exercise its asserted authority to regulate flight attendant occupational health and safety. Finally, because OSHA's duty to provide flight attendants a safe workplace is clear, certain and ministerial, plaintiffs have stated a claim to compel OSHA to assume jurisdiction over the flight attendant workplace pursuant to 28 U.S.C. § 1361.

## **FACTS**

_____The following facts are based upon the allegations of the complaint:

**Flight Attendant Nonfatal Injuries and Illnesses**

Flight attendants encounter a wide variety of occupational hazards while working aboard commercial flights, including turbulence, severe air pressure changes, unwieldy service carts, poorly designed and/or broken luggage bins, balky exit doors and door handles, exposure to toxic chemicals from jet engines that supply bleed air into the passenger cabin, unruly or sick passengers, threats

from and actual instances of terrorism and emergency evacuations.  Complaint "Cmpl." ¶ 7.  In fact,
flight attendants suffer occupational injuries and illnesses at a rate that exceeds workers in all private
industry.  *Id.*

AFA has analyzed U.S. Bureau of Labor Statistics ("BLS") data that categorizes the most
serious workplace injuries and illnesses by events, natures, sources and parts of body affected.
Some of AFA's findings from its analysis of the BLS data include:

- Rates per hours worked of occupational injuries and illnesses among scheduled air transport workers are historically several times greater than the rates for all private industry workers; and even significantly greater than rates observed in the construction industry.  For example, for the years 1994 and 1998, flight attendant injury and illness days away from work incidence rates (8.0 and 7.9 incidents per 100 workers, respectively) were similar to the rates for all scheduled air transport workers (7.7 and 8.4, respectively), and were significantly higher and have decreased much more slowly than the corresponding rates for workers in private industry (2.8 and 2.0, respectively) and the construction industry (4.9 and 3.3, respectively);

- In 2003, the latest year for which overall industry injury and illness rates are available, the days away from work incidence rate for all scheduled air transport workers was 6.2 incidents per 100 workers, compared to a rate for workers in all private industry of 1.5 and a rate for construction industry of 2.6.  The ratios of these rates are little changed from those for 1998; in other words, injuries and illnesses for scheduled air transport workers occur about four times more frequently than for workers in all private industry, and more than twice as often as for those in construction.

*Id.* ¶ 8.

With respect to the specific characteristics of flight attendant injuries and illnesses, AFA's
analysis of the BLS' detailed data yields the following conclusions:

- Overexertion and contact with objects are the most significant exposure events;

- Approximately 90% of cases are traumatic in nature, including sprains/strains/tears, effects of air pressure and bruises and contusions;

- All body parts are affected, but injuries/illnesses to the trunk, head/neck and extremities predominate.

Cmpl. ¶ 9.

## The Occupational Safety and Health Act of 1970

The Occupational Safety and Health Act of 1970 ("OSH Act") was enacted by Congress "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). The OSH Act is administered by the Occupational Safety and Health Administration ("OSHA") and applies to all workplaces in the United States and Territories pursuant to 29 U.S.C. § 653(a) and empowers the Secretary to promulgate regulations and occupational safety standards to ensure that an employer "shall comply with occupational safety and health standards promulgated under this Act." 29 U.S.C. § 654(a)(2).

Under Section 4(b)(1) of the OSH Act, however, the statute does not apply to workplaces where other Federal "agencies exercise statutory authority to prescribe or enforce standards or regulations." 29 U.S.C. § 653 (b)(1) ("Section 4(b)(1)").

## The FAA's Assertion of Jurisdiction Over Crewmember Health and Safety

On July 10, 1975, the Federal Aviation Administration ("FAA") published a statement in the Federal Register asserting complete and exclusive jurisdiction over crewmember health and safety on "civil aircraft in operation . . . from the time it is first boarded by a crewmember, preparatory to a flight, to the time the last crewmember leaves the aircraft after completion of that flight, . . . even if the engines are shut down." 40 Fed. Reg. 29114 (1975). Cmpl.¶ 13. At all times since 1975 the FAA has continued to assert such complete and exclusive jurisdiction over crewmember health and safety aboard a civil aircraft. Cmpl. ¶¶ 13-15. Despite this fact, the FAA has at all relevant times

4

affirmatively declined to exercise its asserted statutory authority to prescribe or enforce standards or regulations affecting the occupational safety and health of crewmembers. *Id.* ¶ 16. Significant areas of regulatory neglect by the FAA include, but are not limited to, recording and reporting of occupational injuries and illnesses, bloodborne pathogens, noise, sanitation, hazard communications, access to employee exposure and medical records, and anti-discrimination protections for reporting safety and health violations. *Id.*

### AFA's 1990 Petition for Rulemaking Occupational Safety & Health Standards for Airline Crewmembers

After fifteen (15) years of FAA refusal to prescribe and enforce comprehensive occupational safety and health standards for crewmembers, on May 8, 1990, AFA filed a petition for rule making with the FAA. *Id.* ¶ 17. This petition asked the agency to adopt selected OSHA safety regulations and apply them to the crewmembers working in the airline industry addressing such areas as the recording and reporting of injuries, access to employee exposure and medical records, right to inspections, safety definitions, the handling of hazardous materials, personal protective equipment, medical and first aid, fire protection, and toxic and hazardous substances. *Id.*

As AFA stated in its petition:

> This petition offers one solution to the gaps in crewmember health and safety coverage caused by the FAA's *de facto* industry-wide preemption of OSHA. Although this industry-wide preemption is probably incorrect as a matter of law, it is the rule currently followed by OSHA and the FAA, with the possible exception of OSHA's record keeping requirement. If the FAA is going to claim total jurisdiction over crewmembers, it should *exercise* that jurisdiction by providing protections equal to those provided by OSHA. It is for that reason that this petition asks the FAA to adopt the OSHA regulations and apply them to crewmembers. (Emphasis added).

Cmpl. ¶ *18.*

5

**FAA's Rejection of AFA's Petition For Rulemaking**

Almost seven (7) years after AFA filed its petition for rulemaking, the FAA finally responded in the form of a one-page letter dated June 6, 1997, which states in part:

> The FAA has determined that the issues identified in your petition may have merit but do not address an immediate safety concern. Because of budgetary constraints, and the need to meet the demands of a changing aviation industry and a complex air transportation system, the FAA finds that it must dedicate its rulemaking resources to the most pressing problems and issue associated with safety. For these reasons, we are unable to consider your petition for Rulemaking; therefore it is denied.

Cmpl. ¶ 19.

Thus, although the FAA conceded that AFA's petition may have merit, it chose to ignore the Union's request for monetary reasons. Nonetheless, AFA continued its efforts to persuade FAA to adopt OSHA standards to ensure crewmember occupational health and safety in the airline industry. *Id.* ¶ 20.

**The August 7, 2000 Memorandum of Understanding Between the FAA and OSHA**

On August 7, 2000, after increased pressure from AFA, the FAA and OSHA entered into an historic "Memorandum of Understanding" ("MOU"), the purpose of which was "to enhance safety and health in the aviation industry." *Id.* ¶ 21. In the MOU, the FAA and OSHA agreed to establish a joint team (FAA/OSHA Aviation Safety and Health Team, "ASH Team" or "Joint Team") to identify the factors to be considered in determining whether the OSH Act's requirements could be applied to the working conditions of employees on aircraft in operation (other than flight deck crew) without compromising aviation safety. Cmpl. ¶ 21.

The MOU required the Joint Team to produce a first report within 120 days from the date of the MOU's execution that addressed whether and to what extent OSHA's existing standards and

regulations with respect to six (6) specific health and safety areas could be applied to employees on aircraft in operation without compromising aviation safety. Cmpl. ¶ 22. The MOU also obligated the FAA to replace its 1975 Federal Register Notice with a new policy statement, published in the Federal Register, setting forth the circumstances under which the regulatory requirements of OSHA will apply to the working conditions of employees on aircraft in operation (other than flight deck crew). *Id.* ¶ 23.

In December 2000, the first report of the FAA/OSHA aviation safety and health team concluded that, with the exception of bloodborne pathogens and noise, the other five (5) subject areas under consideration could be implemented for all employees in the aviation industry without implicating aviation safety concerns. *Id.* ¶ 24. With respect to blood borne pathogens and noise, the report found that the "OSHA requirements that necessitate engineering and administrative controls may implicate aviation safety and would need to be subject to FAA approval." *Id.*

Although the December 2000 report recommended that the ASH Team continue to meet to resolve this and other issues, the team did not meet again until January, 2002, at which time the team could not agree on a time line for implementation of relevant OSHA regulatory standards for employees on aircraft in operation. *Id.* ¶ 25.

**The September 2001 Report of the Office of Inspector General of the DOT**

In September 2001, the Office of the Inspector General ("OIG") for the Department of Transportation ("DOT") issued a report titled: "Further Delays in Implementing Occupational Safety and Health Standards for Flight Attendants Are Likely." ("The OIG Report"). *Id.* ¶ 26. The OIG review was performed in response to a request by Congressman Peter DeFazio who expressed concerns over the dearth of OSHA standards for airline employees in the areas of blood-borne

pathogens, repetitive motion injuries, noise and unhealthy cabin air. Cmpl. ¶ 26.

The OIG Report found that in the 26 years since the FAA asserted statutory authority for prescribing and enforcing occupational safety and health standards for aircraft crewmembers onboard aircraft,

> it has not issued industry standards to address employee safety and health issues associated with working conditions onboard aircraft in operation. Instead, FAA focused its resources on providing and enforcing industry standards for aircraft design and operational problems affecting safety.

Cmpl. ¶ 27.

Furthermore, the OIG concluded that "unless FAA and OSHA resume working together, we have no confidence that industry standards will be issued in the near future to address occupational hazards." *Id.* Accordingly, the OIG report recommended that

> ***If these recommendations are not implemented, it will, in our opinion, be apparent that after 25 years of limited progress, an alternative approach will be necessary. One approach would be to revoke FAA's exclusive authority to provide occupational safety and health standards for employees in aircraft, and have this function performed by OSHA. FAA would then intervene in any regulatory proceedings, when in FAA's judgment, a proposed OSHA regulation would negatively affect the safety of air traffic operations.*** (Emphasis added).

*Id.* ¶ 28.

To date, the FAA and OSHA have taken no steps whatsoever to implement the recommendations of the OIG Report, or in any other way regulate the workplace health and safety conditions of flight attendants. Cmpl. ¶ 29. Although the FAA/OSHA Aviation and Safety Team met on several occasions since the September 2001 OIG's report, they took no recognizable steps to improve employee occupational health and safety in the airline industry. *Id.*

**Aviation Safety and Health Partnership Program**

The FAA took a final step towards the complete abandonment of its August 2000 MOU with OSHA when it announced on March 4, 2003, that it was creating the "Aviation Safety and Health Partnership Program" ("ASHPP"). Cmpl. ¶ 30.  In its announcement in the Federal Register, the FAA claimed that the ASHPP was being created  to provide "empirical data concerning injury and illness hazards on aircraft in operation" to allow air carriers to "voluntarily" provide "selective" safety and health protections for "employees not covered by OSHA."  *Id.*  In addition, the FAA announced that the ASHPP

> would preserve the FAA's preeminent authority over aviation safety issues by reserving to the FAA complete and exclusive responsibility for determining whether proposed abatements of safety and health hazards would compromise or negatively affect aviation safety.

*Id.* ¶ 30.

On March 31, 2003, AFA, along with many of the other affiliated unions of the TTD, wrote to Gene Kirkendall, of the FAA Flight Standards Service, and informed him that the TTD unions were "disappointed with and angered by the FAA's decision to create a voluntary program that will halt the progress we have made over the years towards providing the nation's flight attendants with the federal safety and health protections they need and deserve." *Id.* ¶ 31.  Furthermore, the TTD wrote that it was troubled by the "fact that the ASHPP proposal relies solely on voluntary measures, with no underlying regulatory requirements or enforcement provisions." *Id.*

Since its inception, the ASHPP has failed to propose or institute any mandatory procedures, rules or guidelines for carriers to follow to improve airline employee health and safety protections. *Id.* ¶ 32.  As a result of the voluntary nature of the ASHPP, air carriers have instituted no occupational safety and health improvements to reduce or mitigate flight attendant injuries and

illnesses.  As a direct result of the thirty (30) years of FAA failure to exercise its asserted statutory authority, flight attendants are substantially more likely to be injured on the job than employees in other industries.  Cmpl. ¶ 34.

## STANDARD OF REVIEW

When a federal court is asked to review the sufficiency of a complaint, it is well-settled that "whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheur v. Rhodes,* 416 U.S. 232, 236 (1974).  A complaint is deficient only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  Furthermore, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheur,* 416 U.S. at 236.

## ARGUMENT

I.    **PLAINTIFFS' SUIT IS RIPE FOR JUDICIAL REVIEW AS THE LEGAL ISSUES ARE WELL-DEVELOPED AND THE HARDSHIP THAT WILL ACCRUE TO PLAINTIFFS IF REVIEW IS POSTPONED IS IMMEDIATE, DIRECT AND SIGNIFICANT.**

The Supreme Court has established a two-part test to determine whether a court should assert its jurisdiction to review an agency's action, or postpone such review until the issues "arise in the context of a controversy 'ripe' for judicial resolutions."  *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967).  The so-called "ripeness" doctrine is an attempt "to balance the interests of the court and agency in delaying review against 'the petitioner's interest in prompt consideration of allegedly unlawful agency action'."  *Cronin v. FAA,* 73 F.3d 1126, 1131 (D.C. Cir. 1996) (*citing, Eagle-Picher Industries v. EPA,* 759 F.2d 905, 915 (D.C. Cir. 1985).  In striking this balance, a court must

"evaluate (1) the fitness of the issues for judicial resolution, and (2) the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149.  On the first prong, courts will review agency actions that raise purely legal questions, and generally postpone review if delay until the "policy in question has sufficiently 'crystallized' by taking on a more definite form." *Better Govt. Assoc. v. Dept. of State,* 780 F.2d 86, 92 (D.C. Cir 1986).

With respect to the "hardship" prong, the court "must consider [plaintiffs'] countervailing interest in immediate review," *Cronin,* 73 F.3d at 1133, and whether the postponement of judicial review is "outweighed" by the likelihood of "hardship on the complaining party that is immediate, direct, and significant." *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 480 (D.C. Cir. 1986).

As discussed below, there can be no question that AFA/TTD have plead sufficient allegations supporting its claim that, as a matter of law, the FAA has failed to exercise its jurisdiction to adequately regulate flight attendant working conditions aboard aircraft in operation.  OSHA, in turn, has failed to perform its statutory duty under the OSH Act to ensure a safe and healthful workplace for those employees, and without judicial review, flight attendants will continue to suffer *avoidable* injuries and illnesses.

**Fitness of the Issues**

As the defendants note in their Memorandum Of Points and Authorities In Support of Defendants' Motion to Dismiss "Defs. Memo.,": "Here, at first glance, plaintiffs' Complaint appears to raise purely legal questions."  Defs Memo, p. 10.  Defendants go on to say, however, that plaintiffs' "claim is not ripe for review because they have not availed themselves of the regulatory process which provides plaintiffs with a mechanism to petition FAA for rulemaking." Defs. Memo. p. 10.  In fact, plaintiffs' claim is not predicated on any agency action, order or regulation issued by

11

either the FAA or OSHA, and if it were, plaintiffs would clearly be required to bring its claims to the federal court of appeals. *See Telecommunication Research and Action Center, et al. v. Federal Communications Commission, et al.,* 750 F.2d 70 (D.C. Cir. 1984). Rather, this action is predicated upon the defendants' demonstrated *inaction* in failing to regulate the hazardous working conditions of flight attendants.

As set forth in the Complaint, with the consummation of the Memorandum of Understanding ("MOU") executed between OSHA and the FAA in 2000, those agencies acknowledged that they had previously failed to adequately protect flight attendants from known occupational hazards that directly cause flight attendant injuries. It was an admission that OSHA occupational standards had not been adopted by the FAA, and further that these hazards could be addressed through the application of OSHA standards. Indeed, one of the features of the 2000 MOU was the requirement that the FAA replace its infamous 1975 Federal Register Notice in which the agency asserted complete and comprehensive jurisdiction over employee health and safety on aircraft in operation. The MOU mandated that the FAA replace the 1975 Notice with one that set forth the circumstances under which the regulatory requirements of OSHA will apply to the working conditions of employees on aircraft in operation. Cmpl. ¶ 23.

Moreover, the Inspector General of the DOT issued an OIG Report in September 2001, titled: "Further Delays in Implementing Occupational Safety and Health Standards for Flight Attendants Are Likely." *Id.* ¶ 26. In that report he states that in the 26 years since the FAA asserted authority for prescribing and enforcing occupational safety and health standards for aircraft crewmembers onboard aircraft,

> it has not issued industry standards to address employee safety and health issues
> associated with working conditions onboard aircraft in operation. Instead, FAA has

12

focused its resources on providing and enforcing industry standards for aircraft design and operational problems affecting safety.

Cmpl. ¶ 27.

The OIG also states that "unless FAA and OSHA resume working together, we have no confidence that industry standards will be issued in the near future to address occupational hazards." *Id.* To further that goal, the OIG recommended that the FAA "reinstitute its rulemaking procedures on injury and illness recordkeepng and reporting, which the FAA can do without OSHA's assistance . . . in order to identify the type and frequency of injuries and illnesses occurring." *Id.* ¶ 28. He concluded by stating that

> If these recommendations are not implemented, it will in our opinion, be apparent that after 25 years of limited progress, an alternative approach will be necessary. **One approach would be to revoke FAA's exclusive authority to provide occupational safety and health standards for employees in aircraft, and have this function performed by OSHA.** FAA would then intervene in any regulatory proceedings, when in FAA's judgment, a proposed OSHA regulation would negatively affect the safety of air traffic operations. (Emphasis added).

*Id.*

The FAA and OSHA, have not, of course, followed any of these recommendations. Consequently, flight attendants remain in the same position they have been in since 1975: without adequate regulatory safeguards protecting them against workplace injury. Based upon the 2000 MOU and the OIG Report, as well as the demonstrated lack of regulatory activity with regard to flight attendant occupational health and safety, it is evident that the legal issues presented in this action have "crystallized" and are sufficiently "concrete" to warrant immediate judicial review. *Better Govt. Assoc. v. Dept. of State,* 780 F.2d at 92.

## Hardship To the Plaintiffs In the Absence of Judicial Review

The direct hardship flight attendants will suffer should the Court decline review is evident

13

from the allegations of the Complaint. The BLS has compiled statistics establishing that flight attendants suffer occupational injuries and illnesses at a rate that exceeds workers in all private industry. Cmpl .¶ 7. Flight attendants injury and illness days away from work were significantly higher and have decreased much more slowly than the corresponding rates for workers in private industry; even the construction industry injury and illness rates are significantly lower. *Id.* ¶ 8. Approximately 90% of flight attendant cases are traumatic in nature, and affect all body parts, with injuries/illnesses to the trunk, head/neck and extremities predominate. *Id.* ¶ 9. These remarkably high rates of injury are linked directly to the lack of occupational standards in the flight attendant workplace. Thus, it cannot be disputed that the injury to the plaintiffs would be, literally, "immediate, direct and significant" *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d at 480, if this Court determines that the judicial review should be postponed. Accordingly, this action is ripe for judicial review. *Abbott Laboratories,* 387 U.S. at 149.

## II.    THE FAA HAS FAILED TO "EXERCISE" ITS ASSERTED JURISDICTION OVER WORKPLACE SAFETY ABOARD AIRCRAFT IN OPERATION.

The OSH Act applies to all workplaces in the United States and Territories, and empowers the Secretary of Labor to promulgate regulations and occupational safety and health standards to ensure that an employer "shall comply with occupational safety and health standards promulgated under this Act." 29 U.S.C. § 654(a)(2). Section 4(b)(1) of the OSH Act, on the other hand, provides an exception to OSHA's comprehensive jurisdiction where other Federal "agencies exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health." 29 U.S.C. § 653 (b)(1) ("Section 4(b)(1)"). This exception to OSHA's complete jurisdiction over workplace safety represents the heart of this dispute.

14

Here, the FAA asserts jurisdiction to regulate workplace health and safety for crew members working aboard aircraft in operation based upon its 1975 Notice which provided that the FAA's "safety regulatory responsibilities directly and completely encompass the safety and health aspects of the work environment of aircraft crewmembers." 40 Fed. Reg. 29114 (July 10, 1975). Def.'s Memo., p. 13. Therefore, in the FAA's view, it "has exercised its authority in a manner consistent with that required to preempt OSHA's jurisdiction as set forth in *Mallard Bay,* 534 U.S. at 245." *Id.* In other words, because it has asserted jurisdiction and implemented regulations related primarily to the *operational* safety of aircraft, the FAA argues that it has secured an industry-wide exemption from the application of OSHA occupational standards. This circular reasoning completely misstates the holding of the Supreme Court in *Chao v. Mallard Bay Drilling, Inc.,* 534 U.S. 235 (2002). In fact, the Court explicitly rejected the proposition that an agency can preempt OSHA's jurisdiction simply by asserting jurisdiction, while, in reality, failing to "exercise" that authority to regulate specific working conditions.

In *Mallard Bay,* the Court was asked to decide whether the Coast Guard had jurisdiction to preempt OSHA with respect to the working conditions aboard "uninspected" vessels following the explosion of an offshore oil rig that killed four crewmembers. In reviewing the applicable legal standard for OSHA preemption under 4(b)(1), the Court stated:

> Congress' use of the word 'exercise' makes clear that, contrary to respondents' position, mere possession by another federal agency of unexercised authority to regulate certain working conditions is insufficient to displace OSHA's jurisdiction. Furthermore, another federal agency's minimal exercise of some authority over certain conditions on [uninspected vessels] does not result in complete preemption of OSHA jurisdiction, because the statute also makes clear that OSHA is only preempted if the working conditions at issue are the particular ones 'with respect to which' another federal agency has regulated, and if such regulations 'affect occupational health and safety.' § 653(b)(1).

*Mallard Bay,* 534 U.S. at 241.

Although the *Mallard Bay* Court found that the Coast Guard had executed a MOU with OSHA with respect to the regulation of working conditions on "inspected vessels," it found that the MOU did not extend to the "uninspected vessels like Rig 52." *Id.* at 243. Rather, the Court found that:

> with respect to uninspected vessels, the Guard regulates matters related to marine safety, such as fire extinguishers, life preservers, engine flame arrestors, engine ventilation, and emergency locating equipment. See 46 U.S.C. § 4102 (1994 ed. and Supp. V); 46 CFR pts. 24-26 (2000). Because these general marine safety regulations do not address the occupational safety and health concerns faced by inland drilling operations on uninspected vessels, they do not preempt OSHA's authority under § 4(b)(1) in this case.

*Id.* at 243-44.

Though the Guard did exercise its statutory authority "to regulate a number of specific working conditions on certain types of uninspected vessels, " the Court could not identify "any specific Coast Guard regulations that address the types of risk and vessel at issue in this case; namely, dangers from oil-drilling operations on uninspected barges in inland waters." *Id.* at 244. Therefore, the Court concluded, "simply because the Guard has engaged in a limited exercise of its authority to address certain working conditions pertaining to certain classes of uninspected vessels does not mean that *all* OSHA regulation of *all* uninspected vessels has been preempted." (emphasis in original) *Id.*

*Mallard Bay* thus establishes two (2) important principles regarding OSHA preemption under § 4(b)(1): 1) an agency's assertion of comprehensive, but unexercised, statutory authority to regulate the working conditions of employees is insufficient to displace OSHA jurisdiction, and 2) where the agency does engage in a minimal exercise of its statutory authority, OSHA's jurisdiction is only

preempted with regard to working conditions "with respect to which" another federal agency has in fact regulated, and those regulations "affect occupational safety or health." § 653(b)(1).

Here, the FAA, like the Coast Guard in *Mallard Bay,* seeks to preempt OSHA's jurisdiction based on its assertion of "comprehensive regulatory authority" Def's. Memo, p.13, as well as its promulgation of "regulations regarding a variety of health and safety matters, including blood borne pathogens, engine noise, general safety, and hazard communications." *Id.* at p.14. But a critical look at those regulations reveals that they are designed primarily to ensure the *operational* safety of the aircraft for the traveling public - not the occupational safety or health of crew members. As the DOT's OIG found in his 2001 Report, in the 26 years since the FAA has asserted statutory authority for prescribing occupational safety and health standards for crew members onboard aircraft, the FAA "has not issued industry standards to address employee safety and health issues associated with working conditions onboard aircraft in operation." Cmpl. ¶ 27. Rather, the FAA has spent most of its resources "on providing and enforcing industry standards for aircraft design and operational problems affecting safety." *Id.*

This is further underscored by the 2000 MOU agreed to by FAA and OSHA, which set forth a procedure for the implementation of OSHA standards on such issues as blood borne pathogens, noise, sanitation, hazard communication, anti-discrimination and access to employee exposure/medical records. Cmpl. ¶¶ 21-27. Because the FAA has abandoned any pretense of implementing this MOU, those working conditions remain unregulated by the FAA.

Moreover, the regulations cited by the defendants are similar to the "marine safety" regulations discussed in *Mallard Bay.* The *Mallard Bay* court found those regulations to be directed primarily at *operational* safety, not the occupational safety of the seaman working aboard those

17

vessels.  Similarly, the FAA cites to several regulations which it purports are designed to address

occupational safety aboard aircraft.  For example, defendants cite to the FAA's regulations allegedly

addressing the issue of bloodborne pathogens: 14 C.F.R. §§ 121.309, 125.207, 135. 177.  Defs.

Memo., p. 5.  In fact, those regulations all refer only to the provision of  latex gloves in the

emergency kit required aboard aircraft.  The OSHA standard, on the other hand, 29 C.F.R. §

1910.1030, addresses issues such as Hepatitis B infections, personal protective equipment and

exposure training.  The "noise" regulations referred to by defendants,14 C.F.R. Pts. 21, 36, address

noise emissions affecting the general public *outside* the aircraft, whereas the OSHA standard 29

C.F.R. § 1910.95, refers specifically to effect of noise on the employee in the workplace.

Even if some FAA regulations implicate crewmember safety and health, that limited exercise

of statutory authority is insufficient to obtain an industry-wide exemption from OSHA's

occupational standards.  *Donovan v. Red Star Marine Services Inc.,* 739 F.2d 774, 778 ( 2nd Cir.

1984)("We agree that the term 'exercise' as used in section 4(b)(1) of the Act, requires more than

isolated regulations peripherally affecting the working conditions of employees."); *In Re Inspection*

*of Norfolk Dredging Co.,* 783 F.2d 1526, 1532 (11th Cir. 1986)("We conclude that the Coast Guard's

regulations of safety aboard uninspected vessels is so circumscribed that it does not preempt OSHA's

jurisdiction over crane safety aboard uninspected vessels."); *Herman v. Tidewater Pacific, Inc., et*

*al.,* 160 F.3d 1239, 1245 (9th Cir. 1998)("The Coast Guard has not promulgated regulations that

specifically address the subjects of the Secretary's substantive citation . . [which] leads to this no-

preemption result. . . .  It is apparent that the Coast Guard regulation of uninspected vessels is not

so pervasive as to preempt the Secretary's jurisdiction.").

If this Court adopted the FAA's position, the *status quo* would prevail and neither the FAA

nor OSHA would exercise authority over the working conditions aboard aircraft in operation.  Such

a regulatory vacuum would be contrary to the very purposes of Congress in enacting a statute

designed to prevent workplace injury and illness.  As the court observed in *Red Star Marine:*

> It would do violence to the clear intent of Congress to hold that these instances of
> Coast Guard regulation of working conditions aboard uninspected vessels would
> serve to deny an entire class of employees the protection of major safety legislation
> such as the OSH Act.  There can be no doubt that it was the intent of Congress 'to
> assure so far as possible every working man and woman in the Nation safe and
> healthful working conditions.... 29 U.S.C. § 651(b) ... It is also beyond question that
> section 4(b)(1) of the OSH Act should be interpreted and applied 'to achieve the
> maximum protection for the industrial workers of the Nation.' *Southern Ry. Co.,* 539
> F.2d at 338.

739 F.2d at 780; *accord, Mallard Bay,* 534 U.S. at 245 ("[Coast Guard's] interpretation of § 4(b)(1)

would mean that if the Coast Guard regulated marine toilets on Rig 52 and nothing more, any OSHA

regulations of the vessel would be preempted.  Such large gaps in the regulation of occupational

health and safety would be plainly inconsistent with the purpose of the OSH Act.").

Finally, the FAA argues that the plaintiffs fail to appreciate the "complexities involved in

regulating the cabins of passenger air planes, where the health and safety of the crew are inextricably

intertwined with the health and safety of the air traveling public." Defs. Memo., p. 15.  Apparently,

the FAA believes it is impossible for the agency to adopt OSHA standards, or for that matter, any

occupational standard affecting flight attendant working conditions because of their potential impact

on aviation safety.  That view is belied by the FAA's willingness to explore the implementation of

OSHA standards through the 2000 MOU.  Moreover, as the DOT Inspector General proposed in his

2001 OIG Report, the FAA's asserted authority to provide occupational safety and health standards

could be revoked and transferred to OSHA.  The FAA could then "intervene in any regulatory

proceedings, when in the FAA's judgment, a proposed OSHA regulation would negatively affect the

safety of air traffic operations."  Cmpl. ¶ 28.

Congress passed the OSH Act of 1970 to ensure a safe and healthful workplace for all American workers, even those working aboard aircraft.  FAA's continuing intransigence and indifference to the occupational safety of flight attendants does "violence to the clear intent of Congress" *Donovon v. Red Star,* 739 F.2d at 780, and must end.  Plaintiffs therefore have stated a claim for declaratory relief holding that the FAA has failed to exercise its asserted statutory authority to regulate the flight attendant workplace in violation of Section 4(b)(1).

### III.     THE DISTRICT COURT HAS JURISDICTION OVER PLAINTIFFS' ACTION TO COMPEL OSHA TO FULFILL ITS STATUTORY DUTY TO ENSURE A SAFE AND HEALTHFUL WORKPLACE FOR FLIGHT ATTENDANTS.

Under 28 U.S.C. § 1361, the "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  A district court can grant mandamus relief if the plaintiff has:  "(1) a clear right to the relief sought; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In Re: Medicare Reimbursement Litigation Baystate Health Systems, et al.,* 414 F.3d 7, 10 (D.C. Cir. 2005)(*quoting Power v. Barnhart,* 292 F.3d 781, 784 (D.C. Cir. 2002).  Although mandamus is an extraordinary remedy, it is warranted when the equitable grounds for granting such relief are "compelling." *13th Reg'l Corp. v. U.S. Dept. of the Interior.* 654 F.2d 758, 760 (D.C. Cir. 1980).

As discussed below, the plaintiffs have alleged sufficient facts to support their claim for mandamus relief to compel the Secretary of Labor to carry out her duty to ensure a safe and healthful workplace for flight attendants.  In addition, this court has jurisdiction over plaintiffs' action under § 1361.

**Flight Attendants Are Entitled to the Protection of OSHA's Occupational Standards**

Like all workers in this country, flight attendants are seeking protection against the hazardous conditions that injure and maim them everyday aboard aircraft in operation. Whether a particular incident involves exposure to toxic fumes, punctured eardrums from sudden de-pressurization, or broken bones caused by violent mid-air turbulence, flight attendants are subject to sudden and often catastrophic injury. For thirty (30) years, however, the FAA has asserted untrammeled jurisdiction over all aspects of operational and occupational safety aboard aircraft in operation without addressing these occupational hazards. As the allegations of the complaint establish, the FAA has neglected to exercise that authority to mandate occupational standards addressing flight attendant working conditions, and instead, has focused its resources almost exclusively on ensuring operational safety for aircraft. The plaintiffs do not question the FAA's focus on aviation safety, and agree that the FAA's efforts to promote public safety for the traveling public is appropriate. That focus, however, has created a regulatory vacuum that has left flight attendants essentially unprotected from certain hazardous conditions that inevitably lead to occupational injury and illness while working aboard the aircraft. Such a result is inconsistent with the intent of Congress in enacting the OSH Act, and must be remedied. *Red Star Marine Services,* 739 F.2d at 780.

**OSHA's Duty To Establish Occupational Standards For Crewmembers Aboard Aircraft Is Clear**

OSHA's statutory duty to address the hazardous working conditions causing flight attendant injury and illness cannot seriously be questioned by the defendants. The OSH Act requires the agency to do everything possible to ensure "every working man and woman in the Nation safe and healthful working conditions. . . ." 29 U.S.C. § 651(b). And Section 4(b)(1) cannot be used by OSHA and the FAA to avoid that statutory authority. Rather it should be interpreted "to achieve the

maximum protection for the industrial workers of the Nation." *Southern Ry. Co.,* 539 F.2d at 338.

Leaving an entire class of workers without the protection of the OSH Act hardly satisfies that goal.

*Mallard Bay,* 534 U.S. at 245 ("Such large gaps in the regulation of occupational health and safety

would be plainly inconsistent with the purpose of the OSH Act.").

**FAA's Inaction Has Left Plaintiffs With No Other Adequate Remedy**

AFA and TTD have brought this action to compel OSHA to re-assert its clear statutory

authority to ensure a safe and healthy workplace for flight attendants aboard aircraft. Defendants'

suggestion that the flight attendants should instead  engage in rulemaking to achieve that goal is

preposterous on its face. It is OSHA, not the flight attendants, who is duty-bound by law to address

the acknowledged injuries being suffered aboard aircraft. Because the FAA has demonstrably failed

to regulate those working conditions, and has consistently rejected plaintiffs' efforts to adopt OSHA

standards, plaintiffs cannot reasonably be expected to continue their fruitless efforts to demand that

the FAA carry out its duty under Section 4(b)(1). The FAA's consistent disinterest in occupational

safety and health has been evidenced in several ways: it took seven (7) years for the agency to send

a one-page letter denying the Union's petition for rulemaking, Cmpl. ¶ 19, it has completely

abandoned efforts to implement the 2000 MOU with OSHA, *Id.* ¶¶ 21-25, and it has replaced the

2000 MOU with the "voluntary" ASHPP initiative that has not issued any enforceable standards

regulating occupational safety or health aboard aircraft. *Id.* ¶¶ 30-34..

Given this abysmal refusal to exercise its asserted authority under 4(b)(1), plaintiffs' have

no available remedy but a court order compelling the Secretary of Labor to perform her unambiguous

duty to the employees working aboard aircraft in operation. *In Re Medicare Reimbursement*

*Litigation Baystate,* 414 F.3d at 13("Congress imposed on the Secretary a clear statutory duty to pay

the hospitals these funds.  Having to pay a sum one owes can hardly amount to an equitable reason for not requiring payment.").

**Jurisdiction**

Finally, this court clearly has original jurisdiction over plaintiffs' action in the nature of mandamus under 28 U.S.C. § 1361.  *See In Re Rivlin,* 1999 U.S. App. LEXIS 29583 (D.C. Cir.1999) ("Petitioner's mandamus petition falls within the scope of § 1361 as he is requesting that the court compel employees of the Securities and Exchange Commission to perform a duty allegedly owed to him . . ."), *citing, Peoples v. United States Dept. Of Agric.,* 427 F.2d 561, 565 (D.C. Cir. 1970)("purpose of § 1361 is to permit district courts 'to issue appropriate orders where federal officials are not acting within the zone of their permissible discretion . . . or otherwise contrary to law.' ").  The appellate court would have original  jurisdiction over this action only if plaintiffs were asking for review of a final agency action. *See Telecommunication Research and Action Center, et al. v. Federal Communications Commission et al.,* 750 F.2d 70 (D.C. Cir. 1984)(*"TRAC").*  Here, plaintiffs are asking this Court to compel OSHA to *take* action in performance of its statutory duty to flight attendants.  Should OSHA eventually implement its occupational standards to the working conditions of flight attendants aboard aircraft, then the court of appeals would have exclusive jurisdiction to review its actions.  *TRAC,* 750 F.2d at 78.

## CONCLUSION

Based upon the foregoing, plaintiffs respectfully request that the Court deny defendants' motion to dismiss.

Respectfully submitted,


_____/s/_____
Edward J. Gilmartin, D.C. Bar No. 388361
Deirdre Hamilton, D.C. Bar No.  472334
ASSOCIATION OF FLIGHT
   ATTENDANTS-CWA, AFL-CIO
501 Third Street, N.W., 9th Floor
Washington, DC   20001-2797
(202) 434-0577


_____
Larry I. Willis, D.C. Bar No. 458152
General Counsel
TRANSPORTATION TRADES
DEPARTMENT, AFL-CIO
888 16TH Street, N.W.,   Suite 650
Washington, D.C.  20009
(202) 628-9262

Attorneys for Plaintiffs

24